## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**UNITED STATES OF AMERICA**

**v.**

**BRIAN ASSI**
  a/k/a "Bruno Assi"
  a/k/a "Brahim Assi"
  a/k/a "Ibrahim Assi"
**HAMIT AYKUT UNAL**
**KAMIL TAIB FATAH**
  a/k/a "Kamo Fatah"
  a/k/a "Kamil Tayib"
  a/k/a "Kamo Ali Muhammed"
  a/k/a "Kamil Ali Muhammed"
  a/k/a "Kamil Barghy"
**MOHAMMADALI MOKHBER**
  a/k/a "Ali Mokhber"
**JAHAN AMINIAN**
  a/k/a "Jahan Ozveaminian"
**SAKHT ABZAR PARS COMPANY**
**OKUT MAKINE DANISMANLIK**
**MADEN MUH . ITH. IHR. Tic. LTD STI**
  **and**
**SPECTRA TRANSPORTATION CO. LTD**

**SEALED**
**INDICTMENT**

**Case No.**

1:19CR41 AW/GRJ

**THE GRAND JURY CHARGES:**

## INTRODUCTION

At all times material to this Indictment:

A.    <u>Laws and Regulations</u>

FILED USDC FLND GV
DEC 17 '19 PM2:32

1.     The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701—1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy or economy of the United States when the President declared a national emergency with respect to that threat.

2.     On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No, 12957, as expanded and continued by Executive Orders Nos. 12959 and 13059, was in effect at all times relevant to this Indictment.

3.     Executive Orders Nos. 12959 and 13059 (collectively, with Executive Order No. 12957, the "Executive Orders,") imposed economic sanctions, including a trade embargo, on Iran.  The Executive Orders prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person. The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

2

4.      The Executive Orders authorized the United States Secretary of the

Treasury, in consultation with the Secretary of State, "to take such actions,

including the promulgation of rules and regulations, as may be necessary to carry

out the purposes" of the Executive Orders.  Pursuant to this authority, the Secretary

of the Treasury, through the Office of Foreign Assets Control (OFAC),

promulgated the Iranian Transactions Regulations, subsequently renamed the

Iranian Transactions and Sanctions Regulations (ITSR), 31 C.F.R. Part 560,

implementing the sanctions required by the Executive Orders.

5.      Specifically, absent permission from OFAC in the form of a license,

the ITSR prohibited, among other things:

a.      Any transaction that evades or avoids, has the purpose of

evading or avoiding, causes a violation of, or attempts to violate any of the

prohibitions ITSR (31 C.F.R. § 560.203);

b.      The exportation, re-exportation, sale, or supply, directly or

indirectly, from the United States, or by a United States person, wherever located,

of any goods, technology, or services to Iran or the Government of Iran, including

the exportation, re-exportation, sale, or supply of any goods, technology or services

to a person in a third country undertaken with knowledge or reason to know that

such goods, technology, or services are intended specifically for supply,

transshipment, or reexportation, directly or indirectly, to Iran or the Government of

Iran (31 C.F.R. § 560.204);

      c.    The re-exportation from a third country, directly or indirectly,

by a person other than a United States person, of any goods, technology, or

services that have been exported from the United States if: (i) such re-exportation

is undertaken with knowledge or reason to know that the re-exportation is intended

specifically for Iran or the Government of Iran, and (ii) the exportation of such

goods, technology, or services, was subject to export license application

requirements under any United States regulations (31 C.F.R. § 560.205).

      6.    The Executive Orders and the ITSR were in effect at all times relevant

to this indictment. However, the export discussed in this indictment did not occur

pursuant to an authorized export license from OFAC.

**B.**    **<u>Export and Shipping Records</u>**

      7.    The United States Department of Commerce, through the United

States Census Bureau and the United States Department of Homeland Security,

Customs & Border Protection, participated in and maintained the Automated

Export System (AES), an electronic portal of information for exports of goods

from the United States. The U.S. Census Bureau required the filing of electronic

export information (EEI) through the AES or through AESDirect pursuant to Title

13, Code of Federal Regulations, Part 30. The purpose of these requirements was

to strengthen the United States Government's ability to prevent the export of

certain items to unauthorized destinations and end users because the AES aided in

targeting, identifying, and when necessary, confiscating suspicious or illegal

shipments prior to exportation. 15 C.F.R. §30.1(b). Exporters filed EEI via AES

by entering the data manually into AES via a computer. 15 C.F.R. §30.6(a). EEI

included the date of export, the U.S. Principal Party of Interest, the description of

the commodity to be exported, the intermediate consignee's name and address (if

applicable), the ultimate consignee's name and address, and the country of ultimate

destination. 15 C.F.R. §30.6. Each filing was identified by a unique Internal

Transaction Number (ITN). Exporters, shippers, and freight forwarders were

required to file an EEI for every export of goods or technology from the United

States that had a value greater than $2,500 or for which an export license was

required. (15 C.F.R. Section 758.1; 15 C.F.R. Section 30.2).

### C.    **Defendants and other entities**

8.    Defendant **SAKHT ABZAR PARS COMPANY ("SAP-IRAN")**

was an Iranian engineering and commercial company in the fields of metal cutting,

mining and construction, and steel materials and machinery headquartered in

Tehran, Iran.

9.    Defendant **MOHAMMEDALI MOKHBER**, a/k/a "Ali Mokhber"

(**MOKHBER**), was an employee of **SAP-IRAN**.

5

10.    Defendant **JAHAN AMINIAN**, a/k/a "Jahan Ozveaminian," (**AMINIAN**) was an employee of **SAP-IRAN**.

11.    **OKUT MAKINE DANISMANLIK MADEN MUH . ITH. IHR. Tic. LTD STI (OKUT)** was a Turkish company headquartered in Ankara, Turkey. **OKUT** represented its business as supplying, maintaining, and repairing equipment used in open-pit and underground mining, blasting and explosives manufacturing, and construction machines manufacturing.

12.    Defendant **HAMIT AYKUT UNAL (UNAL)** was an officer of **OKUT**.

13.    **SPECTRA TRANSPORTATION CO. LTD (SPECTRA)** was an Iraqi transportation company with a listed address in Sulaimaniyah, Iraq, which is a city near the Iranian border.

14.    **KAMIL TAIB FATAH,** a/k/a "Kamo Tayib," "Kamo Fatah," Kamil Barghy," and "Kamil Ali Muhammed" (**KAMO**), an Iraqi citizen, was an officer of **SPECTRA**.

15.    Company A was a Swedish engineering firm headquartered in Stockholm, Sweden.  Company A did business in Dubai, United Arab Emirates, through its Middle East Branch.  Company A also operated a factory in Alachua, Florida, through a U.S. subsidiary corporation, for the manufacturing of mining equipment, including self-propelled rotary blasthole drill rigs (Drill Rigs).

6

16.    Defendant **BRIAN ASSI (ASSI)**, a/k/a "Bruno Assi," "Brahim Assi," and "Ibrahim Assi," a Canadian citizen, was employed as a sales manager in Company A's Middle East Branch in Dubai, United Arab Emirates.

**COUNT ONE**
**CONSPIRACY**
**18 U.S.C. §371**

A.    **The Charge**

17.    Between on or about January 3, 2017, and or about July 2, 2018, in the Northern District of Florida and elsewhere, the defendants,

**BRIAN ASSI,**
**a/k/a "Bruno Assi,"**
**a/k/a "Brahim Assi,"**
**a/k/a "Ibrahim Assi,"**
**HAMIT AYKUT UNAL,**
**KAMIL TAIB FATAH,**
**a/k/a "Kamo Fatah,"**
**a/k/a "Kamil Tayib,"**
**a/k/a "Kamo Ali Muhammed,"**
**a/k/a "Kamil Ali Muhammed,"**
**a/k/a "Kamil Barghy,"**
**MOHAMMEDALI MOKHBER,**
**a/k/a "Ali Mokhber,"**
**JAHAN AMINIAN,**
**a/k/a "Jahan Ozveaminian,"**
**SAKHT ABZAR PARS COMPANY,**
**OKUT MAKINE DANISMANLIK**
**MADEN MUH . ITH. IHR. Tic. LTD STI,**
**and**
**SPECTRA TRANSPORTATION CO. LTD,**

did knowingly combine, conspire, confederate, and agree, together and with others,

to commit an offense against the United States, more particularly: to knowingly

and willfully violate the embargo against Iran by attempting to export two U.S.

origin Company A Drill Rigs from the United States to Iran without having first

obtained the required authorization and license from OFAC for such export, in

violation of Title 50, United States Code, Section 1705, and Title 31, Code of

Federal Regulations, Sections 560.203, 560.204, and 560.205.

### B.   **Objects of the Conspiracy**

18.    The objects of the conspiracy were:

a.    To acquire two U.S.-origin Company A Drill Rigs

manufactured in Alachua, Florida, to supply to customers in Iran;

b.    To conceal from United States companies and the United States

Government that the two U.S.-origin Company A Drill Rigs were destined for Iran;

c.    To make financial profit for defendants and other co-

conspirators;

d.    To evade the regulations, prohibitions and licensing

requirements of the IEEPA and the ITSR.

### C.   **Manner and Means**

19.    Defendants and other conspirators would and did use the following

manner and means, among others, to accomplish the objects of the conspiracy:

8

a.      Defendants and other co-conspirators used e-mail accounts and other forms of communication to communicate with co-conspirators and with unwitting participants in the transaction.

b.      Defendants requested quotes for two U.S.-origin Company A Drill Rigs on behalf of co-conspirators and its customers in Iran.

c.      Defendants responded to such requests by convincing Company A and other unwitting parties to the transaction that the ultimate destination of the two U.S.-origin Company A Drill Rigs was a lawful ultimate destination, and not Iran.

d.      Defendants negotiated the terms of the order, including purchase price and delivery terms, for the two U.S.-origin Company A Drill Rigs ordered by defendants for ultimate delivery to Iran.

e.      Defendants conducted international monetary wire transfers for the purchase of the two U.S.-origin Company A Drill Rigs from bank accounts in Turkey to bank accounts in the United States.

f.      Defendants arranged for delivery of the two U.S.-origin Company A Drill Rigs at an address specified by defendants in Iraq for shipment to defendants in Iran.

**D.    Overt Acts**

20.    In furtherance of this conspiracy, and to accomplish its purpose and object, at least one of the conspirators committed or caused to be committed, in the Northern District of Florida and elsewhere, at least one of the following overt acts, described below, among others.

21.    On or about January 3, 2017, **ASSI** used his gmail account to make a note that Company A had "a serious enquiry for 1 or maybe 2 units drill rig." **ASSI** further noted that, based on "information we got from the customer," a certain type of Company A Drill Rig "can be [a] good choice."

22.    On or about January 17, 2017, **MOKHBER,** an employee of **SAP-IRAN,** located in Iran, sent an email to **KAMO,** in which **MOKHBER** requested **KAMO**'s phone number to discuss a buyer questionnaire from Company A, which was attached to the email.

23.    On or about January 18, 2017, **KAMO** replied to **MOKHBER**'s email of January 17, 2017.  In **KAMO**'s email, he provided his cell phone number as **MOKHBER** had requested.

24.    On or about January 23, 2017, **KAMO** emailed **MOKHBER** a partially completed Company A questionnaire which included the name of a quarry in Iraq as the "Customer."

25.    On or about February 15, 2017, **AMINIAN**, **ASSI**, **MOKHBER**, and **KAMO** sent and received emails about a partially completed Company A questionnaire, specifically:

a.    **AMINIAN** used a sap-iran.com account to send an email to **ASSI's** gmail account, not **ASSI's** Company A account, and copying **MOKHBER**, also at an sap-iran.com email account. The email referenced a questionnaire "per request" and asked for confirmation that it was acceptable to send to **ASSI** "officially from Iraq." However, no document was attached to **AMINIAN's** email to **ASSI**.

b.    **ASSI** replied to **AMINIAN**, copied **MOKHBER** on the reply email, and stated that there was no document attached to **AMINIAN's** email.

c.    **AMINIAN** then sent another email to **ASSI**, copying **MOKHBER**, and attaching a partially completed Company A questionnaire. Although it listed the same "Customer" in Iraq as the questionnaire **KAMO** provided **MOKHBER** on January 23, 2017, this questionnaire contained additional information about the purchaser's technical requirements for the Drill Rigs sought.

d.    **AMINIAN** sent another email to **ASSI**, copying **MOKHBER**, apologizing for not attaching the document in a previous email, and stated that he had sent the attachment.

11

    e.    **ASSI** replied to **AMINIAN**, copying **MOKHBER**, and stated that **ASSI** thought the partially completed Company A questionnaire should be "okay" and **AMINIAN** should ask **SPECTRA** to send it.

    f.    **AMINIAN** sent an email to **KAMO**, copying **MOKHBER**, and forwarding the same partially completed Company A questionnaire to **KAMO**, as an attachment, with instructions for **KAMO** to forward it to **ASSI**'s "official e-mail address," a Company A email address. Further, **AMINIAN** provided text for a message to **ASSI** and directed **KAMO** to send the message to **ASSI**.

26.    On or about February 20, 2017, **AMINIAN** sent an email to **KAMO**. Attached to the email was the same partially completed Company A questionnaire that **AMINIAN** had sent to **ASSI** for review on February 15, 2017. The email was a forward of **AMINIAN**'s February 20, 2017, email to **KAMO**.

27.    On or about February 21, 2017, **KAMO** sent emails to **ASSI**, **AMINIAN** and **MOKHBER**. Specifically:

    a.    **KAMO** sent an email to **ASSI**'s Company A email address. The email contained a message which **AMINIAN** had previously asked **KAMO** to relay to **ASSI** on February 15, 2017, and the partially completed Company A questionnaire.

    b.    **KAMO** then forwarded his email to **ASSI** to **AMINIAN** and **MOKHBER**.

28.    On or about February 21, 2017, **AMINIAN** sent an email to **KAMO** and **MOKHBER** directing **KAMO** to forward part of the contents of the body of the email to **ASSI**. The text to be forwarded explained, falsely, the Iraqi quarry's need for two Company A Drill Rigs and guaranteed that the Drill Rigs would be used in Iraq.

29.    On or about February 23, 2017, **ASSI** sent **KAMO** an email. Attached to the email was a document containing technical specifications for a type of Drill Rig manufactured by Company A.

30.    On or about March 4, 2017, **KAMO** sent an email to **ASSI**'s Company A email account in which **KAMO** informed **ASSI** that the quote for the two Company A Drill Rigs was needed that week. Included in the email is text which **MOKHBER** provided to **KAMO** on February 21, 2017, with instructions to send to **ASSI**, and falsely stating that "it can be guaranteed that these rigs will be used in north west [sic] Karbala in Iraq."

31.    On or about March 6, 2017, **ASSI** sent an email to **KAMO** which contained an attachment titled "Budgetary Offer March 5, 2017.pdf." The "Budgetary Offer" was for a Drill Rig produced by Company A "from Alachua, USA" for the Iraqi quarry listed in the questionnaire which **KAMO** had previously provided to **ASSI**'s Company A email address at the direction of **AMINIAN** and **ASSI**.

13

32.    On or about March 7, 2017, **KAMO** sent an email to **AMINIAN** and **MOKHBER,** containing the email sent by **ASSI** on March 6, 2017, that included the attachment titled "Budgetary Offer March 5, 2017.pdf."

33.    On or about March 8, 2017, **AMINIAN** sent two emails to **KAMO**.

a.    In the first email, **AMINIAN** instructed **KAMO** to send a message to **ASSI**, which asked **ASSI** to make technical changes to Company A's offer.

b.    In the second email, **AMINIAN** instructed **KAMO** to ask **ASSI** to arrange for a different port of delivery.

34.    On or about March 8, 2017, **KAMO** sent an email to **ASSI**.  In the email, **KAMO** relayed the messages from **AMINIAN**, asking **ASSI** to make changes to Company A's offer for the Drill Rigs.

35.    On or about March 11, 2017, **KAMO** sent an email to **AMINIAN**. The email forwarded an email **KAMO** had sent to **ASSI** on March 8, 2017, requesting changes to Company A's offer for the Drill Rigs.  In his email to **AMINIAN**, **KAMO** indicated that the forwarded email was the last email **KAMO** had sent to **ASSI**.

36.    On or about March 11, 2017, **KAMO** sent an email to **AMINIAN** and **MOKHBER**.  In the email, **KAMO** stated that he was forwarding the last email he had received from **ASSI**.  Attached to the email was a document titled "Budgetary Offer March 5, 2017.pdf.

14

37.    On or about March 11, 2017, **KAMO** forwarded an email from **ASSI** email with an attachment to **MOKHBER** and **AMINIAN**.  The attachment was from Company A and was a "Budgetary Offer for 2 units of Rotary Drill . . . from Alachua, USA for . . . Iraq" submitted to **SPECTRA** and dated March 10, 2017.

38.    On or about March 12 and March, 13, 2017, **ASSI** and **KAMO** exchanged emails about **SPECTRA**. Specifically:

a.    **ASSI** sent an email to **KAMO**.  In the email, **ASSI** indicated that the "factory" had asked him to share information about **KAMO** and **SPECTRA**'s "customer," asked **KAMO** to provide information about the Iraqi quarry listed on the Company A questionnaire, and asked **KAMO** to send **SPECTRA**'s complete address and registration number.

b.    **KAMO** responded, asking whether there was any difference between the customer and the end user, and what information was required.

c.    **ASSI** replied "[j]ust please send your address and company registration and let [sic] see if they accept it."

d.    **ASSI** later emailed **KAMO**, instructing him to "[p]lease send it on my company email."

e.    **ASSI** sent another email to **KAMO** stating "[t]hey are asking about your full name and if you are the full owner of your company."

    f.      **KAMO** responded that he was not full owner, but the managing director of **SPECTRA**. **KAMO** asked if it was enough to send his full name only.

    g.      **ASSI** replied "[i]t's enough thanks."

39.    On or about May 16, 2017, **AMINIAN** sent an email to **KAMO** directing **KAMO** to send **ASSI** a request for a final purchase invoice with payment terms and a request that all parties meet in Istanbul to finalize the deal.

40.    On or about May 18, 2017, **UNAL** sent an email to **KAMO** and mentioned a meeting to take place in Ankara for the Company A "drill machines."

41.    On or about July 5, 2017, **AMINIAN** sent an email to **KAMO** instructing **KAMO** to send an email to **ASSI** to discuss finalizing the deal for Company A Drill Rigs in Iraq or Istanbul.

42.    On or about July 5, 2017, **KAMO** sent an email to **ASSI**, relaying a message from **AMINIAN**, about scheduling a meeting in Iraq or Istanbul to finalize the deal for Company A Drill Rigs.

43.    On or about July 7, 2017, **ASSI** sent an email to **KAMO** confirming a meeting with the customer in Istanbul anytime **KAMO** suggested.

44.    On or about July 23, 2017, **KAMO** sent an email to **AMINIAN** and **MOKHBER**. In the email, **KAMO** discussed the schedule for his travel to Istanbul.

45.     On or about July 23, 2017, **MOKHBER** sent an email to **KAMO**.  In the email, **MOKHBER** discussed **ASSI**'s schedule for the meeting in Istanbul.

46.     On or about July 23, 2017, **KAMO** sent an email to **MOKHBER**. Attached to the email were tickets for flights for **KAMO** and an **OKUT** officer, departing from Erbil, Iraq, to Istanbul, Turkey, on July 26, 2017, and returning on July 28, 2017.

47.     On or about July 24, 2017, **KAMO** sent an email to **AMINIAN**.  The email forwarded KAMO's July 23, 2017, email to **MOKHBER**, and tickets for flights to Istanbul, Turkey, for **KAMO** and another individual.

48.     On or about July 30, 2017, **AMINIAN** sent an email to **KAMO** thanking **KAMO** and **OKUT** officer for meeting in Istanbul, and instructing **KAMO** to send an email to **ASSI** conveying appreciation for a meeting in Istanbul and requesting a final offer for the two Company A Drill Rigs.

49.     On or about July 30, 2017, **KAMO** sent an email to **ASSI** relaying **AMINIAN**'s message conveying appreciation for a meeting in Istanbul, and requesting a final offer for two Company A Drill Rigs.

50.     On or about July 30, 2017, **ASSI** sent an email to Person A at Company A.  In the email, **ASSI** asked for a revised offer for two units of Company A Drill Rigs, reflecting a 7% discount.

17

51.  On or about August 2, 2017, **ASSI** sent an email to **KAMO** with an attachment.  The attachment was a revised offer from Company A for two Drill Rigs for **SPECTRA**, dated July 30, 2017.  Part of the revised offer listed a down payment of 20%.

52.  On or about August 2, 2017, **KAMO** sent an email to **MOKHBER** and **AMINIAN**.  Attached to email was Company A's revised offer, dated July 30, 2017.  In the email, **KAMO** requested instructions.

53.  On or about August 2, 2017, **ASSI** sent an email to Person A at Company A.  In the email, **ASSI** stated that the revised offer incorrectly listed a down payment of 20% rather than the 30% agreed upon.

54.  On or about August 2, 2017, **ASSI** sent an email to **KAMO**.  Attached to the email was a corrected revised offer, still dated July 30, 2017, but this time listing a down payment of 30% of the total purchase price.

55.  On or about August 3, 2017, **AMINIAN** sent an email to **KAMO** with a message for **ASSI**.  The message for **KAMO** to relay to **ASSI** expressed appreciation that Company A confirmed the purchase of the Drill Rigs and requested an order acknowledgement.

56.  On or about August 3, 2017, **KAMO** sent an email to **ASSI**.  In the email, **KAMO** relayed the message that **AMINIAN** had instructed **KAMO** to send to **ASSI** that same day.

18

57.     On or about August 3, 2017, **ASSI** sent an email to **KAMO**.  In the email, **ASSI** asked **KAMO** to send a purchase order in order for Company A to prepare an order acknowledgement, stating all technical specifications needed.

58.     On or about August 6, 2017, **ASSI** sent an email to **AMINIAN**. Attached to the email was a document titled "[Company A] revised offer 2x[Drill Rigs].pdf."

59.     On or about August 6, 2017, **ASSI** sent an email to **AMINIAN**. Attached to the email was document containing a list of spare parts for the Drill Rigs.

60.     On or about August 6, 2017, **AMINIAN** sent an email to **KAMO**.  In the email, **AMINIAN** directed **KAMO** to create a purchase order for Company A Drill Rigs, with technical specifications, on **SPECTRA** letterhead and to send it to **ASSI**'s "private email," **ASSI**'s gmail account, "to check" the purchase order. **AMINIAN** directed that "[i]f it's O.K, it shall be sent to his [Company A] mail address."

61.     On about August 6, 2017, **KAMO** emailed **ASSI's** gmail account with draft text for the purchase order and asked **ASSI** to review it.  **KAMO** stated in the email that if the text was acceptable, **KAMO** would send **ASSI** a purchase order.

62.     On or about August 6, 2017, **ASSI** sent a reply email to **KAMO** regarding the text for a purchase order.  In his email, **ASSI** stated to proceed with the purchase order and to make a separate order for spare parts.

63.     On or about August 6, 2017, **ASSI** sent an email to **KAMO**.  Attached to email was a document listing recommended spare parts for the Drill Rigs.

64.     On or about August 7, 2017, **KAMO** sent an email to **AMINIAN**. Attached to the email was a document listing recommended spare parts for the Drill Rigs.

65.     On or about August 7, 2017, **AMINIAN** sent an email to **KAMO**.  In the email, **AMINIAN** directed **KAMO** to create a purchase order for spare parts on **SPECTRA** letterhead and send it to **ASSI**.

66.     On or about August 7, 2017, **KAMO** sent an email to **ASSI**.  Attached to the email was a purchase order from **SPECTRA** for two Company A Drill Rigs, and another purchase order from **SPECTRA** for spare parts.

67.     On or about August 8, 2017, **ASSI** sent an email to **KAMO**.  Attached to the email was an invoice from Company A to **SPECTRA** for a 30% payment in the amount of $792,360 for two Company A Drill Rigs.

68.     On or about August 8, 2017, **ASSI** sent an email to **KAMO**.  Attached to the email was an order acknowledgement from Company A, titled "Spectra OA.pdf."

69.     On or about August 8, 2017, **KAMO** sent an email to **MOKHBER** and **AMINIAN**.  Attached to the email was an order acknowledgement from Company A, titled "Spectra OA.pdf."

70.     On or about August 16, 2017, **AMINIAN** sent an email to **KAMO**. In the email, **AMINIAN** directed **KAMO** to send a message to **ASSI**.  The message, which referred to a telephone call, was that the "customer" wanted a different engine for each Drill Rig and was willing to pay extra for the change.

71.     On or about August 16, 2017, **KAMO** sent an email to **ASSI**.  In the email, **KAMO** relayed the text of the message that **AMINIAN** had directed **KAMO** to send to **ASSI** that same date.

72.     On or about August 16, 2017, **ASSI** sent an email to other Company A employees.  The email was a forward of **KAMO**'s email of that same date, and requested instructions regarding the requested change for the engines on the Drill Rigs.

73.     On or about August 22, 2017, **ASSI** sent an email to **AMINIAN**. Attached to the email was a document titled "[Company A] revised Offer 2x[Drill Rigs]- August 17.pdf."

74.     On or about August 22, 2017, **ASSI** sent an email to **KAMO**. Attached to the email was a document titled "[Company A] revised Offer 2x[Drill Rigs]- August 17.pdf."

75.     On or about August 23, 2017, **KAMO** sent an email to **AMINIAN**.
Attached to the email was a document titled "[Company A] revised Offer 2x[Drill
Rigs]- August 17.pdf." The email is a forward of an email **ASSI** sent to **KAMO**
on August 22, 2017.  In the body of his email, **KAMO** requested instructions from
**AMINIAN**.

76.     On or about August 24, 2017, **KAMO** sent an email to **ASSI**.  In the
email, **KAMO** acknowledged receipt of Company A's revised offer and stated "we
will commence sending the downpayment by next week, so kindly keep me posted
whenever received."

77.     On or about August 29, 2017, **AMINIAN** sent an email to **KAMO**.
In the email, **AMINIAN** directed **KAMO** to send a message to **ASSI**.  The
message was a request for Company A to provide a final order acknowledgement.

78.     On or about August 30, 2017, **ASSI** sent an email to **KAMO**.
Attached to the email was an order acknowledgement and an invoice, both issued
by Company A.  In the body of the email, **ASSI** requested that **KAMO** confirm
transfer of the down payment.

79.     On or about September 6, 2017, **ASSI** and **AMINIAN** exchanged a
series of emails. Specifically:

a.     **ASSI** forwarded his August 30, 2017, email to **KAMO** from
his Company A account to his gmail account.

22

      b.     **ASSI** forwarded that email from his gmail account to **AMINIAN**.

      c.     **AMINIAN** responded that he had received the email and thanked **ASSI**.

      d.     **ASSI** replied to **AMINIAN**, directing a money transfer for the down payment on the Company A Drill Rigs be completed immediately and asking **AMINIAN** to have **KAMO** provide bank transfer information. **ASSI** further asked **AMINIAN** to provide **KAMO**'s phone number "in case one of the Dubai idiots wants to thank him.[]"

      e.     **AMINIAN** responded, copying **MOKHBER**, and stating that he had already asked **MOKHBER** to transfer funds. **AMINIAN** also provided **KAMO**'s mobile phone number, as **ASSI** had requested.

80.     On or about September 8, 2017, **AMINIAN** sent an email to **KAMO** in which **AMINIAN** instructed **KAMO** to send an attached wire transfer receipt, titled "down payment.pdf," to **ASSI** and say that it was the down payment for the Company A Drill Rigs, and to ask for an approximate date of delivery. The attached transfer receipt is for $810,360, sent from the account of an **OKUT** officer at a bank in Turkey to an intermediary bank in New York, New York, to a receiving bank in New York, New York. The transfer was for the benefit of Company A's Middle East Branch in Dubai.

23

81.    On or about September 9, 2017, **KAMO** sent an email to **AMINIAN**. In the email, **KAMO** indicated that he sent a wire transfer receipt to **ASSI** as **AMINIAN** had previously instructed him to do.

82.    On or about September 12, 2017, there was an email exchange about **SPECTRA**. Specifically:

a.    **ASSI** sent an email to **KAMO** in which **ASSI** requested **SPECTRA**'s trade license and bank account details for "routine compliance processes."

b.    **KAMO** forwarded **ASSI**'s email to **AMINIAN** and asked for instructions.

c.    **AMINIAN** forwarded **KAMO**'s request for instructions to **MOKHBER**, instructing **MOKHBER** to instruct KAMO "as per discussed."

d.    **MOKHBER** forwarded that email exchange to **KAMO**, copying **AMINIAN**. **MOKHBER** directed **KAMO** to provide **SPECTRA**'s trade license and bank account information to **ASSI**.

83.    On or about September 15, 2017, **KAMO** sent an email to **ASSI**. Included in the email was **SPECTRA**'s bank account information. Attached to the email was **SPECTRA**'s trade license.

84.     On or about September 21, 2017, **KAMO** sent an email to an **OKUT** officer, and copying **UNAL**, in which **KAMO** requested his payment for the deal and asked how much money **SPECTRA** could expect to receive.

85.     On or about October 13, 2017, **AMINIAN** sent an email to **ASSI** in which **AMINIAN** apologized for mistakenly "contacting the idiots in [Company A] Dubai."

86.     On or about October 13, 2017, **ASSI** sent an email to **AMINIAN** in which **ASSI** expressed his loyalty to **AMINIAN**, **MOKHBER**, and **SAP-IRAN**.

87.     On or about October 29, 2017, **ASSI** sent an email to **KAMO**.  In the email, **ASSI** thanked **KAMO** for providing information about **SPECTRA** on September 15, 2019.

88.     On or about November 14, 2017, **AMINIAN** provided **ASSI** with a list of persons to attend a Company A distributor meeting in Dubai in December 2017.  **AMINIAN** and **MOKHBER** were listed as attendees.

89.     On or about November 19, 2017, **ASSI** sent an email requesting lodging for the December 2017 Company A distributor meeting for the list of persons provided by **AMINIAN**, which included **AMINIAN** and **MOKHBER**.

90.     On or about November 20, 2017, **AMINIAN** sent an email to **KAMO**.  In the email, **AMINIAN** directed **KAMO** to send a message to **ASSI**. The message was a request for information for a second payment to Company A

for the Drill Rigs. Additionally, **AMINIAN** stated to **KAMO** that, regarding **SPECTRA**'s payment, **AMINIAN** would call **KAMO** and try to have it completed after the second payment to Company A was made.

91.    On or about November 20, 2017, **KAMO** sent an email to **ASSI**. In the email, **KAMO** made **AMINIAN**'s request to **ASSI** for information about the second payment due to Company A for the Drill Rigs.

92.    On or about November 21, 2017, **ASSI** sent an email to **KAMO**. Attached to the email was an invoice, No. 80818, for the second payment due to Company A for the Drill Rigs.

93.    On or about November 21, 2017, **KAMO** sent an email to **MOKHBER** and **AMINIAN**. Attached to the email was an invoice, No. 80818, for the second payment due to Company A for the Drill Rigs.

94.    On or about November 22, 2018, **AMINIAN** sent an email to **KAMO**. In the email, **AMINIAN** directed **KAMO** to tell Company A that "our order was for" a different engine than that on invoice 80818.

95.    On or about November 23, 2017, **ASSI** sent an email to **KAMO**. Attached to the email was another invoice 80818 from Company A for the Drill Rigs. This version listed a different engine than the prior iteration.

96.    On or about November 23, 2017, **MOKHBER** sent an email to **ASSI**. Attached to the email was Company A's November 23, 2017, invoice 80818, and

26

Company A's revised offer of August 17, 2017, for the Drill Rigs. In the body of the email, **MOKHBER** stated that the attached invoice 80818 was also wrong, and expressed concern that Company A was making the Drill Rigs incorrectly.

97.    On or about November 23, 2017, **KAMO** sent an email to **MOKHBER** and **AMINIAN**. Attached to the email was a revised Company A invoice 80818. The email is a forward of an email from **ASSI** to **KAMO**.

98.    On or about November 23, 2017, **ASSI** sent an email to **KAMO**. In the email, **ASSI** informed **KAMO** that both Drill Rigs would be ready to leave the factory before the last week of February.

99.    On November 23, 2017, **KAMO** sent an email to **MOKHBER** and **AMINIAN**. The email is a forward of an email from **ASSI**, stating that both Drill Rigs would be ready to leave the factory before the last week of February.

100.    On or about January 21, 2018, **AMINIAN** sent an email to **KAMO**. In the email, **AMINIAN** responded to **KAMO**'s request for an update about payment for the Drill Rigs. **AMINIAN** further stated "[w]e have been waiting for the second install[l]ment for the past 15 days" and that the problem should soon be solved.

101.    On or about January 28, 2018, **ASSI** sent an email to Person A at Company A. In the email, **ASSI** stated that "[a]ccording to **KAMO** [t]he payment should be in our account before Thursday."

27

102.    On or about January 30, 2018, **KAMO** sent an email with an attachment to **UNAL** requesting a $70,000 commission for **SPECTRA** in relation to the two Company A Drill Rigs. Attached to the email was an invoice from **SPECTRA**, signed by "Kamil T. Fatah," as "Spectra Chairman." The invoice recited it was for "our commission of selling two drill machines[.]"

103.    On or about February 3, 2018, **UNAL** sent an email to **KAMO** stating "[w]e are going to send the money" but changes were needed to the invoice.

104.    On or about February 3, 2018, **UNAL** sent an email to **KAMO**. Attached to the email was a document titled "Spectra Invoice.docx." The attachment is an invoice from **SPECTRA** signed by "Kamil T. Fatah," as "Spectra Chairman" for $70,000 "against Advance Payment" for the Drill Rigs.

105.    On or about February 3, 2018, **KAMO** sent an email to **UNAL**. Attached to the email was a revised invoice from **SPECTRA** for a $70,000 "against Advance Payment" for the Drill Rigs. In the email, **KAMO** stated he would send the original.

106.    On or about February 6, 2018, **MOKHBER** sent an email to **KAMO**. Attached to the email was a receipt showing a transfer of $810,360 had been made to Company A by an **OKUT** employee to Company A's bank in New York, New York. In the email, **MOKHBER** asked **KAMO** to forward a portion of the email content to **ASSI**. In the content to be forwarded, **MOKHBER** apologized for a

28

delay in making this second payment and gave a list of documents and information he needed before the shipping would be arranged.

107.    On or about February 6, 2017, **KAMO** relayed a message from **MOKHBER** to **ASSI** via email.  Attached to the email was a document titled "swift.pdf."  The attached document was a receipt showing a transfer of $810,360 had been made to Company A by an **OKUT** employee to Company A's bank in New York, New York.

108.    On or about February 7, 2018, an **OKUT** officer sent an email to **KAMO** and advised him to see the attached document.  The attached document is an image of a receipt of a funds transfer of $70,000.00 from **OKUT** to **KAMO** from a bank in Turkey through a correspondent bank in New York, New York, to **KAMO**'s account at another bank in Turkey.

109.    On or about February 27, 2018, **MOKHBER** sent an email to **KAMO** requesting that **KAMO** cause **ASSI** to send another invoice for the two Drill Rigs.

110.    On or about February 28, 2018, **ASSI** emailed **KAMO** a Company A invoice number 60218 for another payment of $810,360 due to Company A.

111.    On or about March 1, 2018, **KAMO** sent an email forwarding Company A invoice number 60218 to **MOKHBER** and **AMINIAN**.

112.    On or about March 2, 2018, there was a series of emails about the recent invoice 60218. Specifically:

a.    **MOKHBER** sent an email to **KAMO** and copied **AMINIAN**. In the email, **MOKHBER** directed **KAMO** to send a message to **ASSI**. In the message to be relayed, **MOKHBER** expressed concern that the recent invoice was incorrect and that Company A may not be building the Drill Rigs to the requested specifications. Attached to the email were invoice 60218 and Company A's revised offer, dated August 17, 2017.

b.    **KAMO** sent an email to **ASSI**. In the email, **KAMO** relayed a message from **MOKHBER** expressing concern that the recent invoice was incorrect and that Company A may not be building the Drill Rigs to the requested specifications.

c.    **KAMO** sent an email to **MOKHBER**. The email forwards the email **KAMO** sent to **ASSI** that same date, relaying a message to **ASSI** from **MOKHBER**.

d.    **KAMO** sent another email to **ASSI**, providing the attachments **MOKHBER** had previously sent **KAMO**.

e.    **ASSI** responded that the invoice was incorrect and a new one would be provided.

f.    **KAMO** forwarded **ASSI**'s email to **MOKHBER** and **AMINIAN**.

113.   On or about March 4, 2018, **ASSI** sent an email to **MOKHBER**. Attached to the email was a revised Company A invoice number 60218 for a third payment for the Drill Rigs in the amount of $810,360. In the email, **ASSI** stated that the document had previously been sent to **KAMO**.

114.   On or about March 4, 2018, **KAMO** sent an email to **MOKHBER** and **AMINIAN**. Attached to the email was an invoice for a third payment of $810,360 for the Drill Rigs which also forwarded an email from **ASSI** to **KAMO**.

115.   On or about March 4, 2018, **KAMO** sent an email to **MOKHBER** and **AMINIAN**. Attached to the email was a document titled "revised Drill string drawing.pdf." In the email, **KAMO** asked for instructions.

116.   On or about March 6, 2018, **MOKHBER** sent an email to **KAMO**. In the email, **MOKHBER** asked **KAMO** to sign and stamp a revised Company A invoice and send it to **ASSI**.

117.   On or about March 6, 2018, **KAMO** sent an email to **ASSI**. Attached to the email were documents titled "Assi 1.jpeg" and "Assi 2.jpeg." The attachments were a stamped Company A invoice for a payment of $810,360, and a stamped drill pipe drawing.

118.   On or about March 6, 2018, **MOKHBER** sent an email to **ASSI**. In the email, **MOKHBER** stated that attached to the email was a payment for an invoice for spare parts. The attachment is a receipt for a payment of $28,635.

31

119.   On or about March 7, 2018, **UNAL** sent **AMINIAN** and **MOKHBER** an email with an attachment.  The attachment was a receipt for a payment of $810,360. In the email, **UNAL** gave instructions that a bill of lading should not be issued before **OKUT** approved a draft bill of lading "in order to handle material in Mersin port on behalf of Spectra company."

120.   On or about March 8, 2018, **MOKHBER** sent an email to **ASSI** in which **MOKHBER** informed **ASSI** that there was a payment receipt attached "on behalf of **SPECTRA**."  Attached to the email was a receipt of a payment caused by an **OKUT** officer to Company A's bank in New York, New York, for $810,360. In the email, **MOKHBER** asked **ASSI** to send draft shipping documents.

121.   On or about March 10, 2018, **AMINIAN** sent an email to **KAMO**. In the email, **AMINIAN** directed **KAMO** to ask **ASSI** for a draft bill of lading.

122.   On or about March 10, 2018, **AMINIAN** sent an email to **KAMO**. The email forwards an email from **UNAL** on or about March 7, 2018. In the email, **AMINIAN** directed **KAMO** to act as **UNAL** instructed in **UNAL**'s March 7, 2018, email.

123.   On or about March 13, 2018, **ASSI** sent an email to **KAMO** in which **ASSI** informed **KAMO** to see the attached signed document.  The attached document is a Company A invoice requesting payment of $270,120, representing

10% of the order value. The document lists terms of payment with 30% received on September 7, 2017; 30% received February 6, 2018; 30% received March 7, 2018 and 10% due before dispatch of the drills from the factory.

124. Between on or about April 20, 2018, and on or about April 23, 2018, there were several emails about the bill of lading. Specifically:

a. **ASSI** sent an email to **KAMO.** In the email, **ASSI** asked for **KAMO**'s approval on a bill of lading.

b. **KAMO** forwarded the email to **MOKHBER** and **AMINIAN**.

c. **MOKHBER** replied, copying **AMINIAN**, and directed **KAMO** to send a message to **ASSI**. The message was to change the port of discharge to Mersin, Turkey. Attached to the email was a bill of lading listing ITN: X20180123094230.

125. On or about April 25, 2018, **KAMO** sent an email to **MOKHBER**. Attached to the email are three images titled "Assi 1," "Assi 2," and "Assi 3." The images are of a bill of lading for two Company A Drill Rigs under ITN: X20180123094230.

126. On or about May 8, 2018, **MOKHBER** sent an email to **KAMO** and **AMINIAN** in which **MOKHBER** advised **KAMO** to see the attached receipt for the final payment for the Drill Rigs "on our behalf by one of our trade partners in Turkey." **MOKHBER** directed **KAMO** to send a message to **ASSI** requesting

shipping documents. Attached to the email is a document titled "swift 1.pdf" and it is a swift receipt for a payment to Company A for $270,120.00.

127.   On or about May 8, 2018, **KAMO** sent an email to **ASSI.** In the email, **KAMO** relayed a message from **MOKHBER**. Attached to the email is a document titled "swift 1" and it is a swift receipt for a payment to Company A for $270,120.00.

128.   On or about May 17, 2018, **KAMO** sent an email to **MOKHBER**. The email forwards a May 16, 2018, email from **ASSI** to **KAMO** about the transport of the Drill Rigs.

129.   On or about June 14, 2018, **ASSI** sent two emails to **KAMO,** each with an attachment.  The first attachment is a Company A bill of lading for Portsmouth Marine Terminal, Virginia, showing a pick up date of June 18, 2018, in Alachua, Florida.  The second attachment is a booking confirmation for departure on July 2, 2018, in Portsmouth, Virginia, with Mersin Port as the place of delivery.

130.   On or about June 14, 2018, **KAMO** forwarded emails from **ASSI,** sent that same date, to **AMINIAN** and **MOKHBER**.

131.   On or about July 2, 2018, **KAMO** sent an email to **MOKHBER** and **AMINIAN**. The email forwarded an email from **ASSI**, which itself forwarded an email from a Company A employee informing **ASSI** that both Drill Rigs were currently at the port and scheduled.

34

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
## ATTEMPTED UNLAWFUL EXPORT
### 50 U.S.C. §§1705 and 2

132.   The allegations in Paragraphs 1 through 131 are incorporated and re-alleged by reference here.

133.   On or about July 2, 2018, in the Northern District of Florida and elsewhere, defendants

**BRIAN ASSI,**
**a/k/a/ "Bruno Assi,"**
**a/k/a "Brahim Assi,"**
**a/k/a "Ibrahim Assi,"**
**HAMIT AYKUT UNAL,**
**KAMIL TAIB FATAH,**
**a/k/a "Kamo Fatah,"**
**a/k/a "Kamil Tayib,"**
**a/k/a "Kamo Ali Muhammed,"**
**a/k/a "Kamil Ali Muhammed,"**
**a/k/a "Kamil Barghy,"**
**MOHAMMEDALI MOKHBER,**
**a/k/a "Ali Mokhber,"**
**JAHAN AMINIAN,**
**a/k/a "Jahan Ozveaminian,"**
**SAKHT ABZAR PARS COMPANY,**
**OKUT MAKINE DANISMANLIK**
**MADEN MUH . ITH. IHR. Tic. LTD STI,**
**and**
**SPECTRA TRANSPORTATION CO. LTD,**

did knowingly and willfully attempt to export the U.S.-origin commodities listed below from the United States to Iran without having first obtained the required

authorization from the United States Department of Treasury: two Company A

Drill Rigs.

All in violation of Title 50, United States Code, Section 1705, and Title 31,

Code of Federal Regulations, Sections 560.203, 560.204, and 560.205, and Title

18, United States Code, Section 2.

## COUNT THREE
## ATTEMPTED SMUGGLING OF GOODS FROM THE UNITED STATES
### 18 U.S.C. §§554 and 2

134.   The allegations in Paragraphs 1 through 131 are incorporated and re-

alleged by reference here.

135.   Between on or about July 2, 2018, the defendants,

**BRIAN ASSI,**
a/k/a "Bruno Assi,"
a/k/a "Brahim Assi,"
a/k/a "Ibrahim Assi,"
**HAMIT AYKUT UNAL,**
**KAMIL TAIB FATAH,**
a/k/a "Kamo Fatah,"
a/k/a "Kamil Tayib,"
a/k/a "Kamo Ali Muhammed,"
a/k/a "Kamil Ali Muhammed,"
a/k/a "Kamil Barghy,"
**MOHAMMEDALI MOKHBER,**
a/k/a "Ali Mokhber,"
**JAHAN AMINIAN,**
a/k/a "Jahan Ozveaminian,"
**SAKHT ABZAR PARS COMPANY,**
**OKUT MAKINE DANISMANLIK**
**MADEN MUH . ITH. IHR. Tic. LTD STI,**
and

**SPECTRA TRANSPORTATION CO. LTD,**

did knowingly attempt to export and send from the United States, U.S.-origin

merchandise, articles and objects, knowing the same to be intended for exportation

contrary to any law and regulation of the United States, to wit, Title 50, United

States Code, Section 1705(a), Executive Orders 12957, 12959, and 13059; Title

31, Code of Federal Regulations, Sections 560.203, 560.204, and 560.205.

All in violation of Title 18, United States Code, Section 554 and Section 2.

## COUNT FOUR
## SUBMITTING FALSE OR MISLEADING EXPORT INFORMATION
### 13 U.S.C. §305 and 18 U.S.C. §2

136.   The allegations in Paragraphs 1 through 131 are re-alleged and

incorporated by reference here.

137.   On or about June 15, 2018, in the Northern District of Florida and

elsewhere, defendants,

**BRIAN ASSI,**
**a/k/a/ "Bruno Assi,"**
**a/k/a "Brahim Assi,"**
**a/k/a "Ibrahim Assi,"**
**HAMIT AYKUT UNAL,**
**KAMIL TAIB FATAH,**
**a/k/a "Kamo Fatah,"**
**a/k/a "Kamil Tayib,"**
**a/k/a "Kamo Ali Muhammed,"**
**a/k/a "Kamil Ali Muhammed,"**
**a/k/a "Kamil Barghy,"**
**MOHAMMEDALI MOKHBER,**
**a/k/a "Ali Mokhber,"**

37

**JAHAN AMINIAN,**
a/k/a "Jahan Ozveaminian,"
**SAKHT ABZAR PARS COMPANY,**
**OKUT MAKINE DANISMANLIK**
**MADEN MUH . ITH. IHR. Tic. LTD STI,**
and
**SPECTRA TRANSPORTATION CO. LTD,**

did knowingly and willfully cause false and misleading export information to be

submitted as an Electronic Export Information submission, and did so through the

Automated Export System in order to further illegal activity, including the

smuggling of two Company A Drill Rigs from the United States to Iran.

In violation of Title 13, United States Code, Section 305, and Title 18,

United States Code, Section 2.

## COUNT FIVE
## CONSPIRACY TO COMMIT MONEY LAUNDERING
### 18 U.S.C. §§1956(h), 1956(a)(2)(A)

138.   The allegations contained in Paragraphs 1 through 131 of this

Indictment are re-alleged and incorporated by reference here.

139.   Between January 3, 2017, and May 8, 2018, in the Northern District

of Florida and elsewhere,

**BRIAN ASSI,**
a/k/a/ "Bruno Assi,"
a/k/a "Brahim Assi,"
a/k/a "Ibrahim Assi,"
**HAMIT AYKUT UNAL,**
**KAMIL TAIB FATAH,**
a/k/a "Kamo Fatah,"

a/k/a "Kamil Tayib,"
a/k/a "Kamo Ali Muhammed,"
a/k/a "Kamil Ali Muhammed,"
a/k/a "Kamil Barghy,"
**MOHAMMEDALI MOKHBER,**
a/k/a "Ali Mokhber,"
**JAHAN AMINIAN,**
a/k/a "Jahan Ozveaminian,"
**SAKHT ABZAR PARS COMPANY,**
**OKUT MAKINE DANISMANLIK**
**MADEN MUH . ITH. IHR. Tic. LTD STI,**
**and**
**SPECTRA TRANSPORTATION CO. LTD,**

did knowingly combine, conspire, confederate, and agree, together and with others,

to knowingly transport, transmit, and transfer, a monetary instrument and funds, to

a place in the United States from a place outside the United States, that is, the

Republic of Turkey, with the intent to promote the carrying on of specified

unlawful activity, to wit: offenses relating to an attempted unlawful export in

violation of 50 U.S.C. §1705, and smuggling goods from the United States in

violation of 18 U.S.C. §554, as charged in Counts Two and Three this Indictment.

In violation of Title 18, United States Code, Sections 1956(h) and

1956(a)(2)(A).

## CRIMINAL FORFEITURE

140. The allegations contained in Counts One through Five of this

Indictment are hereby re-alleged and incorporated by reference for the purpose of

alleging forfeiture.

39

141.   As a result of committing one or more of the offenses alleged in

Counts One through Five of this Indictment, defendants

**BRIAN ASSI,**
**a/k/a "Bruno Assi,"**
**a/k/a "Brahim Assi,"**
**a/k/a "Ibrahim Assi,"**
**HAMIT AYKUT UNAL,**
**KAMIL TAIB FATAH,**
**a/k/a "Kamo Fatah,"**
**a/k/a "Kamil Tayib,"**
**a/k/a "Kamo Ali Muhammed,"**
**a/k/a "Kamil Ali Muhammed,"**
**a/k/a "Kamil Barghy,"**
**MOHAMMEDALI MOKHBER,**
**a/k/a "Ali Mokhber,"**
**JAHAN AMINIAN,**
**a/k/a "Jahan Ozveaminian,"**
**SAKHT ABZAR PARS COMPANY,**
**OKUT MAKINE DANISMANLIK**
**MADEN MUH . ITH. IHR. Tic. LTD STI,**
**and**
**SPECTRA TRANSPORTATION CO. LTD,**

shall forfeit to the United States, pursuant to Title 13, United States Code, Section

305(a)(3), Title 18, United States Code, Section 982(a)(1), and Title 28, United

States Code, 2461(c), any and all of the defendant's right, title, and interest in any

property, real and personal, constituting, and derived from, proceeds traceable to

such offenses, and any personal property that was used or intended to be used to

commit or to facilitate the commission of such offenses.  The United States will

also seek forfeiture of a money judgment for a sum of money equal to the value of

any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

142. If any of the property described above as being subject to forfeiture, as a result of acts or omissions of the defendant:

    i.    cannot be located upon the exercise of due diligence;

    ii.    has been transferred, sold to, or deposited with a third party;

    iii.    has been placed beyond the jurisdiction of this Court;

    iv.    has been substantially diminished in value; or

    v.    has been commingled with other property that cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

A TRUE BILL:

12/17/2019
DATE

LAWRENCE KEEFE
United States Attorney

ANDREW J. GROGAN
Assistant United States Attorney